UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TINDALL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 05196 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MONDELĒZ INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Mondelēz International, Inc. wanted to build a new bakery. It hired a company called Stellar to help. Stellar contacted Tindall Corporation, a precast concrete company. Stellar and Tindall went back and forth about the bakery for almost a year. Then, after a meeting and some emails, Tindall thought it had a deal: Mondelēz would pay Tindall over $20,000,000 to supply the bakery's concrete. But a month or so later Mondelēz gave the concrete work to another company. Tindall found out and sued, alleging breach of contract or, in the alternative, promissory estoppel.[1]

Mondelēz moves to dismiss. R. 25, Mot. Dismiss. There was no contract, it says, only negotiations that fizzled. And there was no definite promise and no reasonable reliance to support promissory estoppel. The Court disagrees. Tindall

---

[1]Citations to the docket are "R. [docket number]" followed by the page or paragraph number. The Court has jurisdiction under 28 U.S.C. § 1332. The parties are completely diverse: Tindall is a citizen of South Carolina, R. 14, Am. Compl. ¶ 1; Mondelez of Illinois and Virginia, *id.* ¶ 2. The amount in controversy is $2.5 million, well over the $75,000 threshold. *Id.* ¶ 37. Venue is proper under 28 U.S.C. § 1391(b)(1) because Mondelez "resides" in this judicial district. *Id.* ¶ 2.

has plausibly pled that a deal was done and, in the alternative, at the least that Mondelēz promised the job to Tindall and Tindall reasonably relied on the promise to start work. Mondelēz's motion is denied.

**I. Background**

Mondelēz is a food company. R. 14, Am. Compl. ¶ 6. It manages and manufactures brands like Oreo, Chips Ahoy!, Triscuit, Cadbury, and others. *Id*. In early 2012, Mondelēz began planning a new bakery in Monterrey, Mexico. *Id*. ¶ 8, 11. It called the bakery plan "Project Arthur." *Id*. ¶ 9. Mondelēz hired Stellar Group, Inc., an architecture and engineering firm, for help. *Id*. ¶ 8. Stellar, acting on Mondelēz's behalf, contacted Tindall in April 2012. *Id*. ¶ 9. Tindall is a precast concrete company. *Id*. ¶ 7. Working out of factories, including one in San Antonio, Texas, Tindall designs and manufactures precast and pre-stressed concrete components for construction projects. *Id*. Stellar asked Tindall for engineering and pricing information on precast concrete for Project Arthur. *Id*. ¶ 9. Tindall responded with a proposal and price to design, manufacture, ship, and install the project's concrete. *Id*. And, for the next half year, Tindall continued to provide Stellar with engineering, scheduling, and pricing information. *Id*. ¶ 10.

At the end of that period—in mid-December 2012—Tindall sent Stellar another proposal. *Id*. ¶ 11. For $21,838,600, Tindall's proposal offered to do "all precast concrete design, fabrication and delivery work" for the project. *Id*.; R. 14-1, Proposal at 1. In 45 paragraphs, the proposal's work-scope section covered everything from "required temporary erection bracing of panels" to "perimeter

2

safety cabling" and "design[ing], furnish[ing] and install[ing] all connections between pieces of Precast Concrete and between Precast Concrete and the structure." Proposal at 3, 5, 7. It also included detailed schedules for how the work would proceed, *id*. at 10-12, 35, and a table listing the concrete pieces that Tindall would fabricate, *id*. at 33.

Along with the proposal, Tindall gave Stellar a warning. Tindall explained that it would have to reserve lots of production capacity at its San Antonio factory for Project Arthur and that, once production capacity at a factory is reserved, Tindall's salespeople stop signing up projects that would need the same factory time. Am. Compl. ¶ 12. Tindall was concerned because once it set aside the production capacity, Tindall could lose revenue if Project Arthur were cancelled and Tindall was unable to reallocate the reserved capacity. *Id*. Stellar, given its industry experience, would likely have known this without being told. *Id*. ¶ 13. Mondelēz, for the same reason, would also have understood. *Id*. (And Stellar probably passed Tindall's warning on anyway. *Id*.) Tindall's concern was exacerbated because the Project Arthur job was both large and tightly scheduled. *Id*. ¶ 16.

A month later, Stellar asked Tindall for more preliminary work. *Id*. ¶ 15. This led Tindall to believe it would ultimately get the job. *Id*. ¶ 13. So Tindall assigned engineers to the project; assigned a project manager at the San Antonio factory; assigned more factory personnel to develop plans and schedules for the work; hired an outside engineering firm; and bought project-specific equipment and

supplies. *Id*. ¶¶ 16-17. It also flew personnel to Stellar's Florida office and to the job site in Mexico. *Id*.

Two months later Tindall emailed a "Precast Concrete Production Planning/Scheduling" memo to Stellar. *Id*. ¶ 18. The memo laid out Tindall's plan to manufacture 4,600 concrete components, explaining that, to get the project done on time, Tindall would need to begin almost immediately. *Id*. Stellar sent the memo on to Mondelēz. *Id*. ¶ 19. And, about two weeks later, Tindall, Stellar, and Mondelēz employees held a meeting. *Id*. ¶ 20. There, a Mondelēz employee unambiguously promised that Tindall would manufacture the precast concrete for Project Arthur, and instructed Tindall to continue preparations. *Id*.

The next day, Tindall sent a confirming email to Mondelēz: "Below is my understanding of our discussion regarding an agreement for the Project Arthur precast scope and next steps." *Id*. ¶ 21; R. 14-3 at 1. Later that day, Mondelēz replied: "I am ok with what you have detailed below." Am. Compl. ¶ 23; R. 14-3 at 1. Mondelēz's reply included several questions and later Mondelēz wrote again to inform Tindall that a customs broker would be calling it to discuss bringing Tindall's precast concrete from Texas into Mexico. Am. Compl. ¶¶ 23, 25.

Based on the meeting and the emails, Tindall officially reserved factory time for Project Arthur. *Id*. ¶ 24. Tindall and Stellar continued to work together on the project for about another month. *Id*. ¶ 26. This included Tindall engineers spending a week at Stellar's Florida office working on shop drawings, which Stellar reviewed. *Id*. Tindall personnel also travelled to the job site in Mexico and met with Mondelēz

4

representatives to discuss logistics. *Id*. ¶ 27. Sometime thereafter, Tindall learned that Mondelēz had awarded the concrete job to a Mexican company—in effect, refusing to work with Tindall. *Id*. ¶ 30.

Roughly a year later, Tindall sued Mondelēz in the United States District Court for the Eastern District of Virginia, alleging the same basic facts and claims as alleged here. R. 26-2, Def.'s Exh. 1, Virginia Compl. Tindall voluntarily dismissed that action without prejudice a month later when, based on a motion to dismiss by Mondelēz, "it became apparent that [the Court] might apply [Virginia] law, and Virginia is reluctant to recognize claims for promissory estoppel." R. 35, Pl.'s Resp. Br. at 23, n.5. Tindall then filed here in the Northern District of Illinois. R.1. Mondelēz moves to dismiss and seeks the attorneys' fees and costs it incurred in the Eastern District of Virginia. R. 26, Def.'s Br.

## II. Legal Standard

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Most claims fall under Rule 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). And it must "contain sufficient factual matter, accepted as true, to "state a claim to relief that is

5

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Factual allegations, but not legal conclusions, are assumed to be true. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

### A. Choice of Law

Both parties agree that Illinois's choice of law rules determine which state's substantive law applies to Tindall's claims. Def.'s Br. at 7; Pl.'s Resp. Br. at 10 n.4.; *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that federal courts sitting in diversity apply forum-state choice of law rules to determine which state's substantive law to apply). For contract and promissory estoppel claims like these, Illinois applies the "most significant contacts" test from § 188 of the Restatement (Second) of Conflicts of Laws. *See Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004); *Kelco Metals, Inc. v. Morgan*, 2010 WL 1427583, *4 (N.D. Ill. Apr. 5, 2010). The parties disagree, however, about which state has the most significant contacts to this case. Tindall believes Texas law controls. Pl.'s Resp. Br. at 9-10. Mondelēz believes that South Carolina law should apply. Def.'s Br. at 8.

No decision is necessary now. Mondelēz only argues South Carolina law and Tindall, despite its preference for Texas, argued South Carolina law along with the law of Illinois and Texas. At this stage of the case, the choice of law does not matter: the legal principles Mondelēz relies on in the dismissal motion are black-letter contract law principles, so which particular state's law applies does not matter in

6

evaluating the motion. Because both sides briefed South Carolina law, the Court will apply that state's law for purposes of deciding this motion.

Tindall also brings up a good reason not to decide now—many of the key facts about the location of important events are missing. Pl.'s Resp. Br. at 9 n.3. For example, the record right now does not say where the key meetings took place or the key emails were sent from or received. So any decision made now might need to be revised in the future. The Court will reserve decision on the choice-of-law issue until the parties can present all the facts and pertinent locations, which they must do the next time a substantive-law issue arises in the litigation.

## B. Contract Claim

Tindall alleges that the post-meeting exchange of emails formed a binding contract. Am. Compl. ¶¶ 33-35. Mondelēz challenges this with two arguments: "[The] email exchange on its face makes clear that (1) it reflects only preliminary negotiations, and (2) there was no meeting of the minds between the parties on essential contract terms." Def.'s Br. at 8-9. Both arguments are rejected.

### 1. Preliminary Negotiations

The question is whether the email exchange created a binding contract or whether it was just preliminary negotiations. What settles the matter is objectively expressed intent. *See Bugg v. Bugg*, 249 S.E.2d 505, 507-08 (S.C. 1978) ("Whether the parties to an oral or informal agreement became bound prior to the execution of a contemplated formal writing is a question depending largely upon their intention."). Intent is "to be determined by the surrounding facts and circumstances

7

of each particular case." *Id.* Here, Tindall's allegations about the "facts and circumstances" surrounding the email exchange make it plausible that the parties meant the exchange to seal the deal.

Put in context, the email exchange is plausibly interpreted as the end of almost one year's worth of negotiations. When the emails went back and forth, Tindall had been working on the project for almost one year and had just met with Mondelēz face to face. Tindall's detailed proposal, listing the scope, order, and ultimate cost of the work, was on the table, and it was referenced in the emails as the basis for the agreement. Under those circumstances, Mondelēz saying that it "was ok with" what Tindall's email proposed raises the inference of an intent to be bound "above the speculative level," *Twombly*, 550 U.S. at 555, especially where neither email said anything like "this is all good so far, but we cannot agree until we hear from 'X' or decide 'Y' or get 'Z' in writing."

Mondelēz's contrary arguments are unpersuasive. According to Mondelēz, the email exchange was only preliminary negotiations because it was never "memorialized in a more formal contract" and the parties "anticipate[d] execution of a contract in the future." Def.'s Br. at 9-10. But South Carolina recognizes that parties may bind themselves to an agreement before writing it out even if they anticipate doing so later. *See Bugg*, 249 S.E.2d at 507-08. So the lack of a written agreement here and the email's anticipation of one are not dispositive. They only matter if they make it implausible (at the pleading stage) that the parties intended to be bound by the email exchange.

8

So, to tie its arguments to intent, Mondelēz argues that it "strains belief that these two companies would contract in such a cavalier manner." Def.'s Br. at 10. In other words, big companies just do not make informal agreements so, being big companies, Mondelēz and Tindall would never have meant for the emails to bind them. This argument fails because it ignores the relevant context. *See Bugg*, 249 S.E.2d at 507-08 (intent "determined by the surrounding facts and circumstances"). Tindall pled that this was a large and fast-moving project and that Tindall had already been working on it for almost one year. Making an email deal with a vendor that had already been involved for that long does not seem "cavalier." Also, the need for speed may have required that formalities be overlooked. And even though there was no final, written, integrated contract there was plenty written about the deal—the emails and the proposal were quite detailed. On top of all this, at the dismissal-motion stage, reasonable factual inferences go in favor of the plaintiff.

Next, Mondelēz points to bits of the emails that identify things that the parties had yet to agree on. Def.'s Br. at 9. Mondelēz does not explain how these things show that the parties did not intend to be bound until they signed a formal agreement. So Mondelēz's argument assumes that no party can enter into an agreement unless all the details are nailed down in advance. But that is not the law. *See Clardy v. Bodolosky*, 679 S.E.2d 527, 530-31 (S.C. Ct. App. 2009) (rejecting argument that no contract existed because "material" and "necessary" terms were agreed to).

9

The law Mondelēz does enlist—its cited cases—does not help it. *Cabot Oil & Gas Corp. v. Daugherty Petroleum, Inc.*, 479 Fed. App'x 524, 528 (4th Cir. 2012), relies on West Virginia's law, not South Carolina's. In *Brockman v. Am. Suzuki Motor Corp.*, it was not hard to see that the letters of intent that the plaintiffs sued on were not intended to bind the parties because they "specifically did not give Plaintiffs any rights." 2012 WL 3264995, at *11-12 (D.S.C. Aug. 10, 2012). Similarly, in *Blanton Enters., Inc. v. Burger King Corp.*, the defendant had specific procedures, made known to the plaintiff but not followed, about what needed to happen before the deal was done. 680 F. Supp. 753, 758 (D.S.C. 1988). *Bugg* is no help either. There, the parties came to terms informally, then one drafted an agreement and sent it to the other with a letter, asking the other to sign it "if, upon review," she agreed. *Bugg*, 249 S.E.2d at 508. That "if" rendered the act of signing a condition precedent to agreement and made the informal agreement unenforceable. *Id*. Here, there was no explicit "if," at least if reasonable inferences are viewed in Tindall's favor.

## 2. Essential Terms

Next, Mondelēz argues that because the emails lacked essential terms they could not have formed a contract even if the parties had wanted them to. Def.'s Br. at 10-12. Mondelēz points to needed "approvals" for component designs; to the lack of delivery information; and the lack of agreement on certain payment terms. *Id*. These arguments are rejected for three reasons. First, Mondelēz ignores the email's reference to Tindall's 34-page proposal, which supplies a great deal of information.

10

Second, Mondelēz fails to explain—or to cite case law explaining—that any of the allegedly missing terms are so material that, without them, the contract fails for indefiniteness. And, again, at the pleading stage, the allegedly missing terms are *not* so clearly material as to render the allegations implausible. Finally, all the terms that are readily identifiable as necessary appear to be there, particularly when the allegations are viewed in Tindall's favor. *See Trident Constr. Co. v. Austin Co.*, 272 F. Supp. 2d 566, 576 (D.S.C. 2003) ("Under South Carolina law, certain terms, such as price, time and place, are considered indispensable.") (internal quotation marks and alterations omitted); Pl.'s Resp. Br. at 4-5 (listing all key terms and citing, correctly, to where they are mentioned in the emails and proposal).

### C. Promissory Estoppel

Tindall pleads promissory estoppel in the alternative to its contract claim. Am. Compl. ¶¶ 38-43. Mondelēz makes two arguments: "Tindall's Amended Complaint fails to allege sufficient facts showing [1] an unambiguous promise that Tindall [2] reasonably relied upon." Def.'s Br. at 12. Again, the Court disagrees.

Promissory estoppel requires "the presence of a promise unambiguous in its terms." *Powers Const. Co., v. Salem Carpets, Inc.*, 322 S.E.2d 30, 33 (S.C. Ct. App. 1984). The promise here was "that Tindall would manufacture the precast concrete products needed for Project Arthur." Am. Compl. ¶ 20. Mondelēz argues that this is too ambiguous for the same reason that it argued that the contract failed for indefiniteness—certain details were left out or left to be decided. Def.'s Br. at 13.

11

This argument—once again—ignores context. There was nothing ambiguous about the alleged promise; it was that Tindall had the job. The parties knew what this meant. The promise came at the end of a meeting that came on the heels of one year of work and a detailed proposal. Remember again that the purported ambiguity must be evaluated with all reasonable inferences in Tindall's favor.

Again, Mondelēz's two cited cases do not help it. Neither relied on ambiguity or even discussed what makes a promise too ambiguous to support a promissory estoppel claim; both merely mentioned the requirement while stating promissory estoppel's elements. *Blanton Enters., Inc.*, 680 F. Supp. at 775 (rejecting promissory estoppel claim because parties meant not to be bound until they signed a formal agreement); *Kraft Real Estate Invs., LLC v. HomeAway.com, Inc.*, 2012 WL 220271, *16 (D.S.C. Jan. 24, 2012) (rejecting promissory estoppel claim because reliance was unreasonable).

Mondelēz next argues that Tindall has not adequately pled reasonable reliance. Def's. Br. at 18. Its argument here is the same as its contract argument that it "strains belief that these two companies would contract in such a cavalier manner." *Id.* at 10, 18-19. Tindall, according to Mondelēz, could not reasonably rely on the alleged promise because big companies just do not do business that way. For the same reasons that the Court rejected the contract-version of this argument— namely, all the context that Mondelēz again ignores—this argument is too rejected.

### D. Fees & Costs

Rule 41(d) of the Federal Rules of Civil Procedure provides that "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court … may order the plaintiff to pay all or part of the costs of that previous action." The "costs of that previous action" can include attorneys' fees if "the substantive statute that formed the basis of the original suit allows for the recovery of such fees as costs or the court finds that the plaintiff acted in bad faith." *Espenscheid v. DirectSat USA, LLC*, 708 F. Supp. 2d 781, 795 (W.D. Wisc. 2010) (citing *Esposito v. Piatrowski*, 223 F.3d 497, 500 n.5 (7th Cir. 2000)); *see also New Louisiana Holdings, LLC v. Arrowsmith*, 2012 WL 6061710, at *10 (N.D. Ill. Dec. 4, 2012) ("[T]he Court possesses the inherent authority to specifically order attorneys' fees under Rule 41(d).").

Here, Mondelēz seeks costs and attorneys' fees. Def.'s Br. at 15-16. It argues that Tindall's move from Eastern District of Virginia to this Court was forum shopping, which it says counts as bad faith so as to allow it to recover fees. *Id*. The Court will not impose either fees or costs because there is no bad faith in Tindall's actions. Tindall admits that it miscalculated by filing in Virginia. Pl.'s Resp. Br. at 23 n.5. That does not strike the Court as a bad-faith move designed to needlessly multiply proceedings and run-up costs; rather, it strikes the Court as a mistake.

## IV. Conclusion

Mondelēz's motion to dismiss and for fees and costs is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 3, 2015