| | | |
|---|---|---|
| TINDALL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 05196 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MONDELEZ INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case illustrates that if a company wants to make sure that it has a real deal with another company—especially a multi-million dollar deal—put it in writing.[1] Not just emails, but a formal, written agreement. Tindall Corporation brought this lawsuit against food-and-beverage conglomerate Mondelez International, alleging breach of contract and promissory estoppel. R. 14, Am. Compl.[2] Tindall claims that Mondelez awarded it a multi-million dollar contract to engineer, fabricate, and deliver precast concrete for the construction of a Mondelez factory in Mexico—only for Mondelez to break its word and give the work to another company. *Id.* But Mondelez disputes that the parties ever came to an agreement.

---

[1] This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are diverse (Tindall is a citizen of South Carolina and Mondelez is a citizen of Illinois and Virginia) and the amount-in-controversy exceeds $75,000.

[2] Citations to the docket are indicated by "R." followed by the docket entry, and when necessary, a page or paragraph number. Citations to the Local Rule 56.1 Statements of Fact are "DSOF" (for Mondelez's Statement of Facts) [R. 87]; "PSOF" (for Tindall's Statement of Facts) [R. 100]; "Pl.'s Resp. DSOF" (for Tindall's Response to Mondelez's Statement of Facts) [R. 99]; and "Def.'s Resp. PSOF" (for Mondelez's Response to Tindall's Statement of Facts) [R. 110]. Where a fact is undisputed, only the asserting party's statement of facts is cited; where an assertion is made by one party and is otherwise challenged, it is so noted.

Instead, Mondelez contends, the parties engaged in negotiations, those negotiations fizzled, and Tindall is now trying to lay claim to money that it is not owed. R. 85, Def.'s Mot. for Summ. J. Mondelez now moves for summary judgment. *Id.* For the reasons discussed below, the motion is granted.

## I. Background

In deciding Mondelez's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, Tindall. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A. Project Arthur

In early 2012, Mondelez International decided to construct a new, large-scale industrial bakery. R. 87, DSOF ¶¶ 1, 6. It hired Stellar Group, a construction management company based in Florida, to help with the project, dubbed "Project Arthur." *Id.* ¶ 1, 6. Stellar's role was to assist in the development of a project floor plan, site plan, budget and schedule. *Id.* ¶ 6.

Stellar was also responsible for vetting companies to perform the project's precast work. *See* DSOF ¶ 7. Precast work involves designing and fabricating concrete at a manufacturing facility, and then assembling the pieces at the construction site. *Id.* ¶ 8. If the manufacturing facility is near the construction site, then the precast pieces only need to be moved a short distance. R. 99, Pl.'s Resp. DSOF ¶ 8. But if the facility is far away—as is sometimes the case—arrangements must be made to transport the pieces over that distance. DSOF ¶ 8. The alternative

to precast concrete is cast-in-place concrete. *Id.* There, a small concrete facility is set up on the construction site, and the concrete is poured directly into place. *Id.*

In April 2012, Stellar contacted several companies and asked them to submit proposals for various precast items for Project Arthur. DSOF ¶ 7; Pl.'s Resp. DSOF ¶ 7. One of those companies was Tindall Corporation, a precast concrete manufacturer based in South Carolina. *Id.* ¶ 3. Tindall submitted its initial proposal for precast fabrication in May 2012. DSOF ¶ 9; R. 88-5, DSOF at Exh. 5, May Proposal. The May Proposal identified a "Base Proposal Scope of Work," priced at $9,734,000 and two "Alternates," potential add-on packages that were priced $6,647,200 and $4,782,200. May Proposal; Pl.'s Resp. DSOF ¶ 9. Tindall proposed to produce the precast at its plant in San Antonio, Texas. DSOF ¶ 11.

From July 2012 to November 2012, Chris Palumbo, Tindall's Vice President for Business Development, regularly discussed the project with Stellar. R. 100, PSOF ¶ 2; R. 101, Palumbo Aff. ¶ 5. Palumbo provided Stellar with information that they had requested about precast engineering, pricing, and scheduling. PSOF ¶ 2.

The relationship continued to progress as the year drew to a close. Palumbo submitted a revised precast budget to Michael Smith, Stellar's Director of Project Development, in October 2012, PSOF ¶ 3, and Stellar representatives visited Tindall's San Antonio plant in November to vet the facility, *id.* ¶ 5. Shortly afterwards, Tindall representatives travelled with Stellar to Mexico, where Mondelez had decided to build Project Arthur. *Id.* As of this point, Tindall had dealt exclusively with Stellar; although a Mondelez representative was scheduled to join

the November trip to Tindall's San Antonio plant, he had to pull out due to illness. *Id*.

Around this time, Tindall also started talking to Stellar about providing the precast engineering services for Project Arthur, on top of the precast manufacturing. DSOF ¶ 71. On November 26, Tindall submitted an initial proposal to provide the engineering services for $75,000. DSOF ¶ 72; R. 88-10, DSOF at Exh. 10. This proposal was later updated in February 2013 and March 2013. DSOF ¶ 72; R. 88-19; DSOF at Exh. 19; R. 89-1, DSOF at Exh. 21.

In December 2012, Tindall submitted a formal bid to provide precast design, fabrication, and delivery for Project Arthur for the lump-sum price of $23,269,600. DSOF ¶ 15; PSOF ¶ 6; R. 100-9, PSOF at Exh. 9, Tindall Bid. Upon reviewing all of the bids it received, Stellar recommended to Mondelez that it "give the package to Tindall." DSOF ¶ 16. By March 2013, Stellar was hinting to Tindall that it would soon receive the contract from Mondelez. PSOF ¶ 11.

### B. The March 20 Meeting

Tindall and Mondelez had their first direct contact on March 20, 2013, at a meeting at Stellar's headquarters in Jacksonville, Florida (call it the "March 20 Meeting"). DSOF ¶ 21. Tindall was represented by Palumbo, and Mondelez by Carlos Nicot, the Project Arthur Procurement Lead. *Id.* Michael Smith also attended the meeting. *Id.*

Tindall alleges that, during this meeting, Palumbo and Nicot entered into an oral agreement. Palumbo testified that Nicot awarded Tindall a precast

4

engineering, fabrication, and delivery contract and directed Tindall to reserve capacity in the San Antonio factory for Project Arthur. PSOF ¶ 14. Palumbo further testified that he and Nicot "agreed to the price, the scope, our concessions, [and] the schedule" of the work. *Id.* Specifically, Palumbo averred that, towards the end of the meeting, Nicot said something along the lines of "I can work with you guys. I know I can work with you guys," which Palumbo took as his assent to the terms discussed that day. DSOF ¶ 22.

Nicot disputes that he offered the precast contract to Tindall, entered into any agreements, or directed Tindall to reserve capacity. R. 110, Def.'s Resp. PSOF ¶ 14. He admits, however, that he and Palumbo discussed Alternates (the potential add-on packages) and that he authorized Stellar to pay Tindall $177,000 for precast engineering services. *Id.*

### C. The March 21 Emails

The next day, Palumbo and Nicot exchanged a series of emails that will be central to this outcome of this case. DSOF ¶ 26; R. 89-2, DSOF at Exh. 22, March 21 Emails. Palumbo kicked off the chain with an email to Nicot, copying Smith, with the subject line, "Project Arthur—Tindall Precast—Recap of March 20 2013 meeting—next steps" (call this email the "Palumbo Email"). March 21 Emails. In the body, Palumbo wrote: "Carlos—Thank you for your time yesterday. Below is my understanding of our discussion regarding an agreement for Project Arthur precast scope and next steps." *Id.* He then listed a number of "Items," consisting of what he believed to be agreed terms, as well as scheduling notes and action items:

1. Tindall will use the December 14, 2012 proposal as a base scope for purposes of our agreement.

2. Tindall and Stellar identified a number of changes and associated added costs and deductions to the December 14 scope. Stellar provided a summary the (sic) base cost and changes to date during our meeting.

3. Tindall has received the latest project drawings as of March 20, 2013 and will validate the scope of the precast and all changes and values no later than April 29, 2013.

4. The March 20, 2013 documents will become the basis for Tindall/Mondelez precast supply agreement and price.

5. As part of the overall contract, Tindall will provide the first $200,000 of accepted changes to the scope at no cost to the project.

6. Tindall will reduce the proposed $477,000 engineering fee by $300,000 to $177,000 plus reimbursable expenses.

7. Tindall will provide storage of manufactured product at Tindall's San Antonio plant for a maximum of two months at no cost. Tindall will charge $250 per piece per month for any precast stored more than two months at our plant.

8. Tindall has included a total of $305,000 in our price for our field services on-site during construction. The services include two Tindall personnel on-site during delivery and erection of the precast structure in addition to four local personnel to support any field adjustments necessary to the precast. Tindall will agree to pass through the actual cost of salaries for these employees and contract labor and expenses without the addition of any overhead & profit.

9. Payments to Tindall will be in US dollars.

10. Mondelez plans to assign the Tindall contract to the project General Contractor, Copachisa. Copachisa will be responsible for payment to Tindall net 60 days.

11. Mondelez will guarantee payment of Tindall's contract.

12. Carlos will provide email to Palumbo regarding Copachisa financial position and summary of review by Mondelez excluding any confidential information.

13. Mondelez will provide Tindall with a $3,000,000 down payment the day the contract for fabrication and delivery is executed.

14. Tindall will provide a bond for the $3,000,000 down payment. The cost of a $3,000,000 down payment bond is $45,000.

15. Tindall will not charge a finance charge for payments that are made within 60 days of invoice.

16. Tindall and Mondelez will negotiate a retainage structure and amount that is within industry standards.

17. Tindall has received the current project drawings from Stellar as of Wednesday March 20. Tindall will validate the base scope and identify all modifications and associated costs by March 29, 2013.

18. Tindall will provide a graduated cost reduction for finishes based on the unit costs provided to Stellar and the final selection of Architectural finishes by the owner.

19. Stellar will contract with Tindall for the engineering services for precast and will release Tindall on Thursday March 21.

20. Tindall and Mondelez will negotiate payment terms for the precast manufacture/delivery agreement by March 29, 2013.

21. Mondelez will release Tindall to proceed with manufacturing no later than April 1, 2013.

22. Tindall will start production of precast elements for the project no later than April 29, 2013.

March 21 Emails. The list of Items was followed by five "Next Steps":

1. Tindall has submitted a proposal to Stellar for engineering as of March 21, 2013. Stellar to release Tindall Engineering.

2. Tindall will submit a proposed cost reduction scenario for Architectural finishes no later than Monday March 25.

3. Email from Carlos regarding Copachisa financials.

4. Tindall/Mondelez to finalize contract terms by April 29, 2013.

5. Tindall/Stellar to schedule precast engineering/coordination meeting for the week of April 1, 2013.

*Id.*

Nicot responded later that day, stating ""I am ok with what you have detailed below with the following comments" ("Nicot Response"):

a) Can you provide us a cut-off date regarding when we need to finalize specs?

b) On point # 8, what is the net benefit in dollars that we will realize from the change in the charging model?

c) I am assuming the graduated discount schedule on finishes will deliver additional benefits that have not already been included in this model.

d) This email will confirm that we have performed an analysis of Copachisa's financial statements and have concluded that they have the financial capacity to undertake the Project Arthur construction project. If you need any additional information, please advise.

March 21 Emails. Palumbo replied with answers to Nicot's questions ("Palumbo Reply"), and Nicot concluded the chain by informing Palumbo that "Jesus Arenas [a procurement manager at Mondelez's Mexican affiliate] will call you to discuss the use of customs broker to support the delivery of the product to our site" ("Nicot Sur-Reply"). *Id.*; DSOF ¶ 29.

On March 22, Smith emailed Palumbo, stating "Let this email serve as notification that Tindall will be formally awarded the design and fabrication of the project once negotiations can be resolved next week with Carlos." DSOF ¶ 43; PSOF ¶ 19.

**D. The Alleged Breach**

In April, the parties began to move forward with some of the Items and Next Steps identified in the Palumbo Email. For example, Tindall representatives attended a multi-day series of precast design meetings at Stellar's offices, and Tindall drafted and submitted shop drawings to Stellar for approval. PSOF ¶ 19. Palumbo traveled to the Project Arthur site with Jose Villalba, Tindall's San

Antonio project manager, to meet with rail shipping companies and review rail sidings in order to determine how best to transport precast from Tindall's facility to the Project Arthur site. PSOF ¶ 23. Tindall attended other meetings about the precast scope of work, delivery, schedule, and erection with Stellar, Ernst & Young, Copachisa (Project Arthur's general contractor), and two Mexican precast companies. *Id.*

But in other respects, the project stalled. Importantly, Mondelez had yet to purchase the land for Project Arthur, DSOF ¶¶ 38-39, a fact that Tindall knew, *id.* ¶¶ 50-51, so no construction could move forward. In fact, Mondelez did not complete the land purchase until July 2013. *Id.* ¶ 39. Additionally, a number of Items from the Palumbo Email never came to pass: Mondelez never provided Tindall with a $3 million down payment (Item 13); the parties did not negotiate a specific retainage structure and amount (Item 16); Tindall never provided a bond for that down payment (Item 14); Mondelez did not release Tindall to proceed with manufacturing by April 1 (Item 21); and Tindall did not start production of precast elements by April 29 (Item 22). *Id.* ¶ 54. Finally, Tindall and Mondelez never "finalized contract terms" (Next Step 4), *id.*, despite several emails from Palumbo to Nicot in April and May 2013 asking for a draft contract to review, *id.* ¶¶ 47-51.

The engineering services contract that was supposed to be executed by Stellar and Tindall also fizzled out (Item 20). Stellar prepared a draft agreement, but Tindall wanted to include language conditioning ownership of design elements on the execution of a contract with Tindall for all Project Arthur precast services—

including manufacture and delivery. DSOF ¶ 73. Stellar balked, stating that it had no authority to issue contracts for manufacture and delivery, because it was not the Project Arthur general contractor. *Id.* Without its requested clause, Tindall declined to execute the engineering services agreement. *Id.* ¶ 74.

What's more, the parties failed to take a number of steps that might be expected of two parties newly entered into a precast contract. For example, Tindall never forwarded the March 21 Emails—containing the terms of the alleged deal—to the general manager of the San Antonio plant, where Tindall supposedly was going to make the precast. DSOF ¶ 41. Mondelez never visited the San Antonio plant. *Id.* ¶ 56. And Tindall never produced any precast concrete for Project Arthur. *Id.* ¶ 55.

Tindall did, however, reserve the full capacity of the San Antonio plant for seven months. DSOF ¶ 66; Pl.'s Resp. DSOF ¶ 66. It claims that, because of Project Arthur, it "walked away" from three other projects. *Id.* ¶ 70. But beginning in May 2013, with confidence in Project Arthur on the wane, Tindall began to bid on other jobs that might be fabricated during the production slot initially reserved for Mondelez. PSOF ¶¶ 36-37.

In July 2013, everything came to a halt. Mondelez pulled the plug on precast altogether, choosing instead to use cast-in-place concrete for Project Arthur. DSOF ¶ 75. It hired a Mexican concrete manufacturer to provide that service. *Id.* Tindall, claiming that this alleged about-face violated the oral contract made at the March 20 Meeting, filed this lawsuit in response.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

## A. Choice of Law

As an initial matter, a dispute between the parties as to the applicable substantive law must be resolved. Both parties acknowledge that federal courts sitting in diversity "appl[y] the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citation omitted); *see* R. 86, Def.'s Br. at 9; R. 97-6, Pl.'s Resp. Br. at 6-7. Mondelez argues that, because Illinois applies the "most significant contacts" test in breach-of-contract and quasi-contract claims, Florida law applies because, among other things, the March 20 Meeting took place in Florida. Def.'s Br. at 9-10 (citing *E. Lynn Fertilizers, Inc. v. CHS, Inc.*, 2010 WL 5070752, at *3 (C.D. Ill. Dec. 3, 2010); *Kelco Metals, Inc. v. Morgan*, 2010 WL 1427583, at *4 (N.D. Ill. Apr. 5, 2010)).

But, as Tindall correctly points out, Illinois law only permits a choice-of-law determination "when a difference in law will make a difference in the outcome." *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014); *Universal Underwriters Ins. Co. v. LKQ Smart Parts, Inc.*, 963 N.E.2d 930, 945 (Ill. App. Ct. 2011). That is, "[i]f the law of the jurisdictions in question is essentially the same on the disputed point, there is no need to apply a choice-of-law analysis. ... In the absence of a conflict, Illinois law applies as the law of the forum." *Universal Underwriters*, 963 N.E.2d at 945.

It is up to the party seeking to apply the law of another state—in this case, Mondelez—to demonstrate a conflict between the substantive law it wants applied

and the law of the forum state. *See Bridgeview Health*, 10 N.E.3d at 905. Mondelez

has made no attempt to do so.[3] So no choice-of-law analysis is needed and Illinois

law applies.

## B. Breach of Contract

Tindall and Mondelez dispute whether a contract was ever formed between

the parties. "In Illinois, an offer, an acceptance, and consideration are the basic

ingredients of a contract." *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill.

2006) (citing *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 639 (Ill. 1977)). Tindall

argues that these ingredients are all present, but gives the Court two stories of

contract formation. In the complaint, Tindall argues that the Palumbo Email

constituted an offer, and the Nicot Response was an acceptance. Am Compl. ¶¶ 33-

34. But in its response brief to Mondelez's motion for summary judgment, Tindall

asserts that its cause of action arises out of an oral contract formed at the March 20

Meeting. Pl.'s Resp. Br. at 7-25. In any event, as it turns out, neither the March 20

Meeting nor the emails on March 21 qualify as a contract.

---

[3]Instead, Mondelez curiously asserts that the required "conflict" is not a conflict between the *outcomes* generated by applying Florida versus Illinois law, but a conflict between the *parties* as to which jurisdiction's law applies. R. 109, Def.'s Reply Br. at 3. In support, Mondelez cites *Wood v. Mid-Valley Inc.*, a Seventh Circuit case interpreting Indiana law. 942 F.2d 425 (7th Cir. 1991). But in that case, the Seventh Circuit declined to address choice of law because the parties agreed that Indiana law governed and so had not preserved the issue; the circuit court's decision merely stated that a dispute between the parties is *necessary* to trigger a choice-of-law determination, not that it is sufficient. *Id.* at 426-27.

## 1. The March 20 Meeting

In its response to the motion for summary judgment, Tindall claims that Mondelez breached an oral contract that Nicot and Palumbo made on behalf of their respective employers at the March 20 Meeting. Pl.'s Resp. Br. at 7. Oral contracts are subject to the same requirements of contract formation as written ones—there must be an offer, an acceptance, and consideration. *Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 754 (Ill. App. Ct. 2013). According to Tindall, Palumbo and Nicot discussed "the price, the scope, [the parties'] concessions, [and] the schedule" of the precast engineering, fabrication, and delivery work for several hours at the March 20 Meeting. PSOF ¶ 14. At the end of the meeting, Nicot said something along the lines of "I can work with you guys. I know I can work with you guys." DSOF ¶ 22. These words, Tindall contends, manifested Nicot's assent to the terms discussed. Pl.'s Resp. DSOF ¶ 22. The terms of the alleged oral contract were later memorialized in the Palumbo Email. PSOF ¶ 15. And because the existence of that oral contract can only be gleaned from the dueling testimony of Palumbo and Nicot—who disagree as to what was said at the March 20 Meeting, *see* PSOF ¶ 14, Def.'s Resp. PSOF ¶14—it is a factual dispute for the jury to consider and summary judgment must be denied. *See* Pl.'s Resp. Br. at 9, 14-15. Or so Tindall argues.

But not so fast. Although "the intent of the parties to an oral contract" is ordinarily a question of fact, it "may become a question of law if the [relevant, material] facts are undisputed and there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." *Ceres Ill. Inc. v. Ill.*

*Scrap Processing, Inc.*, 500 N.E.2d 1, 4 (Ill. 1986); *see also Tru-Grind, Inc. v. Swiss-Tech, LLC*, 2012 WL 4093158, at *2 (N.D. Ill. Sept. 17, 2012).

For example, formation of an oral contract is a matter of law "[w]here the parties intend for a written or formal contract to follow negotiations." *Lal v. Naffah*, 500 N.E.2d 699, 702 (Ill. App. Ct. 1986) (citations omitted). If that is the case, "there can be no agreement until the written document is executed." *Id.* (citations omitted). To be sure, "[w]here the parties have assented to all the terms of the contract, the mere reference to a future contract in writing will not negative the existence of a present contract." *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990) (citations omitted); *see also Ceres*, 500 N.E.2d at 5. But "just as language anticipating the execution of a final contract does not rule out the possibility that the parties intended for their preliminary writing to bind them, neither does the absence of a 'subject to' clause carry talismanic significance." *Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983, 999 (7th Cir. 2003) (internal citations omitted). If the parties "make the reduction of the agreement to writing, and its signature by them, a *condition precedent* to its completion," an oral "agreement" will not be an enforceable contract until its written counterpart is executed. *Quake*, 565 N.E.2d at 994 (emphasis added). That is true *even if* the parties orally agreed to all of the terms of the contract, and no further negotiation is necessary. *Id.*

So, the first step in analyzing Tindall's breach of contract claim is to decide whether Tindall and Mondelez *could* have, as a matter of law, entered into an

enforceable oral agreement. That is, even if Nicot and Palumbo agreed to the *terms* of a precast arrangement at the March 20 Meeting, did they intend for a formal writing to "complete" the deal and make it binding? If so, then whatever they agreed to on March 20 cannot support a contract claim.

Under Illinois law, courts may look at the following factors to determine whether the parties intended to reduce their agreement to writing: "whether the type of agreement involved is one usually put into writing, whether the agreement contains many or few details, whether the agreement involves a large or small amount of money, whether the agreement requires formal writing for the full expression of the covenants, and whether the negotiations indicated that a formal written document was contemplated at the completion of the negotiations." *Quake*, 565 N.E.2d at 994 (citing *Ceres*, 500 NE.2d at 5). "Also, where the anticipated document is never executed, the parties' conduct and statements subsequent to the oral agreement may be decisive of the question of whether a contract has been made." *Ceres*, 500 N.E.2d at 5.

The terms of the alleged oral contract can be found in the Palumbo Email, which Palumbo and Nicot agreed was an accurate record of what they discussed on March 20. PSOF ¶ 15; Def.'s Resp. PSOF ¶ 15. Based on the email, some factors do weigh in Tindall's favor. Although the email itself is short, it incorporates by reference several lengthier documents—such as the Tindall Bid, the "March 20, 2013 documents," and various project drawings, March 21 Emails—that contain "many details," *see Quake*, 565 N.E.2d at 994. And, although it might be prudent to

formalize agreements of similar dollar value, Mondelez has not specifically alleged that this "type of agreement [for example, for precast services] is one usually put into writing," *see id.*—as are, for example, contracts for the sale of real estate. *But see* DSOF ¶ 31; R. 91-5, DSOF at Exh. 55, Palumbo Dep. at 172:11-14 (Q: "Are you aware of any contracts exceeding 1 million dollars that Tindall has entered on the basis of an email exchange?" A: "No."); R. 92-1, DSOF at Exh. 56, Villalba Dep. at 204:18-25 (testifying that Tindall usually reserves capacity upon receipt of a "confirmation of award in some written form").

But the other factors weight so heavily in Mondelez's favor that Mondelez ultimately wins the day. As an initial matter, the words that Tindall alleges comprised Nicot's assent—"I can work with you guys," Pl.'s Resp. DSOF ¶ 22; Pl.'s Resp. Br. at 26—do not "strongly suggest the parties knew that they were doing something more than discussing proposals." *Cf. Rosenthal v. Battery Partners VI, L.L.C.*, 2007 WL 2028169, at *10 (N.D. Ill. July 10, 2007) (recognizing that, despite the court's "mild surprise" that the parties would intend to enter into a $9.75 million agreement based on a phone call, the parties' "unambiguous language"— "Thanks, and we have a deal," followed by the response, "Fine"—worked in the plaintiff's favor). As the Seventh Circuit has recognized, "contracting parties can and often do approach agreement by stages." *Ocean Atl.*, 322 F.3d at 999 (citing *Empro Mfg. Co. v. Ball-Co Mfg., Inc.,* 870 F.2d 423, 426 (7th Cir. 1989)). Just because the parties have reached a consensus on particular terms, or indicated a

desire to work together in the future, does not mean that a contract has been formed.

Next, the alleged agreement involved a lot of money—over $23 million, according to Tindall. *See* PSOF ¶ 6; Tindall Bid. This suggests that the parties would have wanted to put a formal, written agreement in place. *See PFT Roberson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728, 730 (7th Cir. 2005) (noting that wanting a "complete and formal arrangement before being bound … is to be expected in a multi-million-dollar deal that would last for many years"). And the Palumbo Email declared in multiple places that "a formal written document was contemplated at the completion of the negotiations." *See Quake*, 565 N.E.2d at 994; March 21 Emails. These references to the formal written contract were not mere throwaways. For example, $3 million hinged on Item 13, which stipulated that Mondelez would pay Tindall a $3 million down payment "the day the *contract* for fabrication and delivery is *executed*." March 21 Emails (emphases added). And Item 20 stated that "Tindall and Mondelez will negotiate payment terms for the precast manufacture/delivery agreement by March 29, 2013." *Id.* Finally, the Email expressly set a goal date for the actual finalization of the contract's terms: Next Step 4 required "Tindall/Mondelez to finalize contract terms by April 29, 2013." *Id.*

The last point is the kicker. Tindall argues that the "contract" referred to in Next Step 4 was a "formalization of all [the] disparate documents referenced in the March 21, 2013 email exchange … and consolidation of them into one document or one form, as well as the resolution of the limited number of items that had not been

entirely finalized." Pl.'s Resp. DSOF ¶ 54 (internal quotation marks omitted). But this suggests that the formal contract was precisely *not* "to be prepared only as a memorialization of the oral agreement." *Cf. David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.*, 897 F.2d 288, 293 (7th Cir. 1990). Palumbo's email explicitly stated that there were additional terms to be worked out. Even accepting Tindall's characterization of Next Step 4, the only reasonable inference is that the parties did not intend for any oral "agreement" to be binding.

Examination of the parties' "conduct and statements subsequent to the oral agreement" further supports the conclusion that no oral contract was made. *See Ceres*, 500 N.E.2d at 5. True, Tindall continued to meet with Stellar and Mondelez representatives to discuss precast design, shipping, scope of work, delivery, schedule, and erection. PSOF ¶¶ 19, 23; DSOF ¶ 45. But these discussions are not inconsistent with the behavior of two parties continuing to negotiate a complex contract. What's more, the conduct of *Tindall* executives after the March 20 Meeting strongly suggests that even those executives did not believe they had an enforceable contract on hand. For example, Palumbo portrayed the Palumbo Email—specifically, the Items which, according to Tindall, constitute the terms of the oral contract—as his "understanding of [his and Nicot's] discussion *regarding* an agreement for Project Arthur." March 21 Emails (emphasis added); PSOF ¶ 15. If the Email was intended as a "recap" of the contract terms, as Palumbo has since alleged, PSOF ¶ 15; R. 101, Palumbo Aff. ¶ 21, why not state that the Items reflect Palumbo's understanding *of the* agreement, instead of the "discussion" *regarding an*

agreement? What's more, inexplicably, no one at Tindall forwarded the March 21 Emails to the general manager of Tindall's San Antonio facility—the facility that would actually carry out any precast contract. DSOF ¶ 41.

Other emails tell a similar story. After Villalba visited the Project Arthur site in April 2013, he cautioned another Tindall executive, "We have to thread (sic) carefully here—please communicate to Pat that *there are no contracts issued on this project yet*." DSOF ¶ 45 (emphasis added). That same day, he sent another email to Greg Force, Tindall's President and COO, questioning whether Tindall should proceed "in the absence of a contract being issued and every major player working 'at risk' …" DSOF ¶ 46. Palumbo evidently shared Villalba's concerns, emailing Nicot on April 17, April 30, May 3, May 8, and May 13 to ask about the status of the written contract. DSOF ¶¶ 47-51.

Tindall describes the contract referenced in Villalba and Palumbo's emails as a mere formality, a "consolidated contract" that would simply "set forth all the terms[] of the parties['] March 21, 2013 agreement … and identify any alternative scope items that had been definitively selected." Pl.'s Resp. DSOF ¶ 47. But that characterization is not supported by the wording of Palumbo's April and May emails to Nicot. For example, in the May 3, 2013 email, Palumbo asked Nicot for "preliminary contract documentation … [to] start reviewing." DSOF ¶ 49. Similarly, the May 13, 2013 email asked for an update on "Draft Contract to Tindall for review/comment." DSOF ¶ 51. Palumbo's repeated references to the anticipated formal agreement as a "preliminary" or "draft" document do not suggest that the

written agreement would merely memorialize a defined oral contract. The undisputed facts demonstrate that the parties cannot, as a matter of law, have entered into an enforceable oral agreement on March 20, 2013.2. The March 21 Emails

Even if any March 20 "agreement" is unenforceable, that still leaves the question of whether the March 21 Emails between Palumbo and Nicot can serve as an independent basis of contracting. The answer is no.

"In order for a contract to come into being there must be mutual assent between all of the parties." *Urban Sites of Chi., LLC v. Crown Castle USA*, 979 N.E.2d 480, 496 (Ill. App. Ct. 2012). The existence of mutual assent is determined based on the parties' "objective manifestation of intent" and not their "subjective understanding." *Id.*

Here, the terms of the alleged offer (that is, the Palumbo Email) were too indefinite and uncertain to form a binding contract. "Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." *Fries v. United Mine Workers*, 333 N.E.2d 600, 605 (Ill. App. Ct. 1975) (quoting Restatement (Second) of Contracts § 32(1)). That is, there must be a "basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* "The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." *Id.*

The Palumbo Email contained a number of open-ended items: Tindall had to "validate the scope of the precast and all changes and values" (Item 3); Tindall and Mondelez had to "negotiate a retainage structure and amount that is within industry standards" (Item 16); Tindall would "validate the base scope and identify all modifications and associated costs" (Item 17); Tindall would "submit a proposed cost reduction scenario for Architectural finishes" (Next Step 2); and Tindall and Mondelez were to "finalize contract terms" (Next Step 4). March 21 Emails; DSOF ¶ 26; PSOF ¶ 16. And although indefinite contractual terms do not always stand in the way of contract formation, there must be some "practicable, objective method" for determining whether those terms have been breached. *See Fries*, 333 N.E.2d at 605 (holding that defendant's promise that plaintiff would receive a pension "computed on the same basis as pensions for officials covered by the union pension plan" was not too indefinite to be enforceable, even though plaintiff did not know the exact formula or amount that he would take home). That is not the case here. For example, take a look at Item 16 ("Tindall and Mondelez will negotiate a retainage structure and amount that is within industry standards"). According to Tindall, the "'industry standard' for retainage is typically 5-10%." PSOF ¶ 16; March 21 Emails at Palumbo Email Item 16. But if Mondelez failed to pay the retainage or paid the incorrect amount, Item 16 does not give the parties or the Court a "practicable method" of determining the damages owed, or even whether Mondelez had breached Item 16 at all. And—more importantly—Next Step 4 ("Tindall/Mondelez to finalize contract terms") implied that *none* of the Items—even

those that appeared definite on their face—were final[4]; rather, all Items remained subject to further negotiation.[5]

Moreover, on its face, Nicot's response to the Palumbo Email is not an objective manifestation of acceptance. The Palumbo Email's subject line read, "Project Arthur—Tindall Precast—*Recap of March 20 2013 meeting*—next steps" and the Email itself reflected, in Palumbo's own words, his "understanding of [his and Nicot's] *discussion regarding an agreement* for Project Arthur." March 21 Emails (emphases added). The Email ended, "Carlos … let me know if I missed anything." *Id.* Instead of explicitly accepting Palumbo's offer (if indeed it was an offer), Nicot replied, "I am ok with what you have detailed below *with the following comments*," followed by two requests for more information and two comments. *Id.* (emphasis added). As a response to an alleged offer, Nicot's words are indefinite. The Nicot Response can only reasonably be read as an agreement that Palumbo accurately recorded their discussion at the March 20 Meeting, not as his intent to be bound by the terms of the Email.

---

[4]The inference that even the seemingly "settled" Items remained subject to negotiation is supported by Palumbo's embedded reply to Nicot's March 21, 2013 email. *See* March 21 Emails at Palumbo Reply. In response to Nicot's question about Item 8 (not an open-ended Item), Palumbo seemed to continue negotiating: "If you want to consider this, we are willing to let you have any positive benefit, we estimate it could be as much as $50,000, and we are willing to split any negative impact with you 50%/50% if the cost exceeds the $305K." *Id.*

[5]Tindall argues that this interpretation of Next Step 4 is "simply an inference, and there is a contrary reading of the document that is also plausible." Pl.'s Resp. Br. at 10. But that is not the standard at the summary judgment stage. Although the Court must draw all *reasonable* inferences in Tindall's favor, *see Matsushita*, 475 U.S. at 574, Tindall cannot win simply by providing a *plausible* reading of the facts.

When the Court decided Mondelez's motion to dismiss this case, R. 42, 3/3/15 Opinion, the Court noted that the "facts and circumstances surrounding the email exchange ma[de] it plausible that the parties meant the exchange to seal the deal." *Id.* at 8. But that ruling was made under a more lenient legal standard: the Court was required to take all of Tindall's factual allegations and true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and Tindall needed only to "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Given the heightened summary judgment standard, and with the benefit of discovery, the context surrounding the March 21 Emails does not, in the end, give rise to a reasonable inference of an intent to be bound.

The record makes clear that, despite Tindall's arguments to the contrary, "the need for speed" was not a "plausible reason[] why the parties were willing to agree to an email contract" even though the project involved complex terms and a multi-million dollar price tag. *Cf.* Pl.'s Resp. Br. at 15; *see also* 3/3/15 Opinion at 9. At the time of alleged contracting, Mondelez had not even purchased the land on which Project Arthur would be built, DSOF ¶ 51, and Tindall was well aware of this fact, *see, e.g.,* R. 89-11, DSOF at Exh. 31, 4/23/13 Emails (Palumbo: "It sounds like [Mondelez] will not commit to anything until the land deal is wrapped up."); R. 89-13, DSOF at Exh. 33, 5/1/13 Email (Palumbo: "Carlos has talked internally with Mondelez management and they do not have any appetite for making any commitments on the project such as precast until the land deal is completed."). Indeed, more than a month after the March 21 Emails, the project's entire timeline

remained up in the air. *See* 4/23/13 Emails (Palumbo: "Mondelez is not ready to commit to a schedule for the project as a whole and … may not be able to make critical decisions related to the precast scope of the project and make commitments to us to start production ..."). Given the delay in completing the land purchase (which was not done until July 1, 2013, DSOF ¶ 39), there was no immediate need to get moving that "required that formalities be overlooked." *Cf.* 3/3/15 Opinion at 9. The Court does not find that the March 21 Emails constitute a binding contract.

### 3. The Engineering Services Contract

Even if the parties had no contract for precast fabrication and delivery, Tindall argues that, at the very least, it had an agreement to provide Mondelez with precast engineering services. Pl.'s Resp. Br. at 24-25. Specifically, Tindall claims that Nicot "admitted that he agreed that Tindall would perform engineering services for Project Arthur at [the March 20 Meeting] and agreed upon the price [Mondelez] would pay." *Id.* at 25 (citing PSOF ¶ 14). But Nicot actually testified that he, Palumbo, and Smith agreed that "*Stellar* would contract with [Tindall] for those engineering services, and [Mondelez] would authorize Stellar to pay on [Mondelez's] behalf." R. 91-2, DSOF at Exh. 54, Nicot Dep. at 268:11-15 (emphasis added); Def.'s Resp. PSOF ¶ 14. Stellar in fact drew up an engineering services contract and presented it to Tindall, but it was *Tindall* that refused to sign. DSOF ¶¶ 73-74; PSOF ¶ 34.

Tindall claims that the Stellar contract was "merely an administrative mechanism for handling payment for the engineering services (which Mondelez

wanted to flow through Stellar), and that engineering was part of the deal it had struck with Mondelez." Pl.'s Resp. Br. at 25. As discussed in the previous sections, there was no "deal" with Mondelez, so that cannot serve as the contractual foundation for Tindall to get paid for its engineering services. *See* Sections III.B.1, 2. And Tindall rejected Stellar's offer for a separate engineering agreement. So Tindall really has no leg to stand on. There was no engineering contract, and therefore no breach of contract claim.

## C. Promissory Estoppel

In the absence of a valid contract claim, Tindall hopes to prevail on a theory of promissory estoppel. To succeed, Tindall must "allege and prove that (1) [Mondelez] made an unambiguous promise to [Tindall]; (2) [Tindall] relied on such promise; (3) [Tindall's] reliance was expected and foreseeable by [Mondelez]; and (4) [Tindall] relied on the promise to its detriment." *Quake*, 565 N.E.2d at 1004 (citations omitted). But because Tindall cannot satisfy even the first element, its promissory estoppel claim fails as a matter of law.

In Tindall's telling, Nicot's statements "I can work with you guys," DSOF ¶ 22, and "I am ok with what you have detailed below with the following comments," March 21 Emails at Nicot Response, constitute an "unambiguous promise." Pl.'s Resp. Br. at 25-26. But Nicot's statements—even when considered within the context of the parties' lengthy negotiations at the March 20 meeting—are not unambiguous (as discussed in Section III.B), nor are they promises. *Compare Quake*, 565 N.E.2d at 993, 1005 (holding that the statement "we have elected to

award the contract for the subject project to your firm …" could support a claim for promissory estoppel), *with Vogt v. Total Renal Care, Inc.*, 2016 WL 3763074, at \*8 (Ohio Ct. App. July 14, 2016) (statements that plaintiff was the "likely candidate" for a position and that defendant "needed to continue to work with [her] to develop her to that end" were "hardly clear and unambiguous promise[s] of promotion sufficient to support a promissory estoppel claim"), *and Columbia Pictures Television v. Krypton Broad. of Birmingham., Inc.*, 106 F.3d 284, 292 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 340 (1998) (a promise by one party to "work with" another party is "not a clear and unambiguous promise, for it clearly contemplated further negotiations to finalize the terms" of the agreement (quotations omitted)).

The Seventh Circuit, applying Illinois law, has emphasized that "promissory estoppel is not a doctrine designed to give a party … a second bite at the apple in the event that it fails to prove a breach of contract. Under Illinois law, a claim for promissory estoppel will only succeed where all the other elements of a contract exist, but consideration is lacking." *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (internal citations and quotation marks omitted) (addressing plaintiff's promissory estoppel claim in light of his contract claim's failure to meet requirements of statute of frauds). And the contract that Tindall alleged "did encompass a 'bargained-for' exchange in that [Tindall] claimed that [it] would be paid certain amounts of money" for providing precast fabrication, engineering and delivery. *See id.* at 679 n.9. In that case, "to allow the doctrine of promissory

estoppel to be invoked … becomes a gratuitous duplication or, worse, circumvention of carefully designed rules of contract law." *Id.* (citation and quotation marks omitted). So as Tindall's contract claims failed, so must its claim of promissory estoppel fail.

Because Tindall cannot prevail on any of its claims, the Court need not address the question of damages.

## IV. Conclusion

For the reasons stated above, Mondelez's motion for summary judgment, R. 85, is granted. Judgment will be entered in Mondelez's favor. The status hearing of April 7, 2017, is vacated.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 29, 2017